IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Seante L. Smith,            ) | |
| )                           | Civil Action No. 6:15-1750-PMD-KFM |
| Plaintiff,     ) | |
| )                           | **REPORT OF MAGISTRATE JUDGE** |
| vs.              ) | |
| )                           | |
| Carolyn W. Colvin, Acting   ) | |
| Commissioner of Social Security, ) | |
| )                           | |
| Defendant.     ) | |
| _____) | |

This case is before the court for a report and recommendation pursuant to Local Civ. Rule 73.02(B)(2)(a)(D.S.C.), concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying his claims for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits on November 7, 2011, alleging that he became unable to work on July 12, 2009. The applications were denied initially and on reconsideration by the Social Security Administration. On August 3, 2012, the plaintiff requested a hearing. In his pre-hearing brief, the plaintiff amended his alleged disability onset date to November 3, 2011 (Tr. 235-39; *see also* Tr. 61). The administrative law judge

_____

[1]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

("ALJ"), before whom the plaintiff and Otis Pearson, an impartial vocational expert, appeared on August 23, 2013, considered the case *de novo*, and on December 20, 2013, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied the plaintiff's request for review on March 17, 2015 (Tr. 1-3). The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

> (1)    The claimant meets the insured status requirements of the Social Security Act through March 31, 2012.
>
> (2)    The claimant has not engaged in substantial gainful activity since July 12, 2009, the alleged onset date[2] (20 C.F.R §§ 404.1571 *et seq.*, and 416.971 *et seq.*).
>
> (3)    The claimant has the following severe impairments: degenerative joint disease in the hip, hypertension, cardiomyopathy, chronic kidney disease, and obesity (20 C.F.R. §§ 404.1520(c) and 416.920(c)).
>
> (4)    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 416.920(d), 416.925 and 416.926).
>
> (5)    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a) except the claimant cannot operate foot controls. Further, he can only occasionally perform postural activities such as climbing ramps and stairs, balancing, kneeling, stooping, crouching, and crawling. He may never climb ladders, ropes, or scaffolds. Finally, the claimant should avoid exposure to excessive vibration, hazards, and unprotected heights.

---

[2]As set forth above, the plaintiff amended his alleged disability onset date to November 3, 2011, in the pre-hearing brief, and his attorney noted the amendment during the administrative hearing (Tr. 61, 235-39).

2

(6)    The claimant has no past relevant work (20 C.F.R. §§ 404.1565 and 416.965).

(7)    The claimant was born on April 15, 1972, and was 37 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 C.F.R. §§ 404.1563 and 416.963).

(8)    The claimant has at least a high school education and is able to communicate in English (20 C.F.R. §§ 404.1564 and 416.964).

(9)    Transferability of job skills is not an issue because the claimant does not have past relevant work (20 C.F.R. §§ 404.1568 and 416.968).

(10)    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 404.1569, 404.1569(a), 416.969 and 416.969(a)).

(11)    The claimant has not been under a disability, as defined in the Social Security Act, from July 12, 2009, through the date of this decision (20 C.F.R. §§ 404.1520(g) and 416.920(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## **APPLICABLE LAW**

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment. 20 C.F.R. §§ 404.1520, 416.920. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* §§ 404.1520(a)(4), 416.920(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456

4

(4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

### *Medical Evidence*

The plaintiff was treated at Hillcrest Memorial Hospital on November 3, 2011, for hypertension and shortness of breath. He underwent a renal ultrasound that showed no obvious abnormality, only a probable small cyst on a his right kidney. The plaintiff was admitted to the intensive care unit where he underwent testing and x-rays, including an echocardiogram that showed concentric left ventricular hypertrophy with left ventricular diastolic dysfunction with normal ejection fraction of about 55-60% and chronic renal insufficiency along with abnormal creatinine. He received multiple doses of beta blockade and started a Carden drip, and his dyspnea quickly resolved with the improvement of his blood pressure. The plaintiff was diagnosed with dyspnea secondary to hypertension,

5

tobacco abuse/dependence, stage IV chronic kidney disease, and chronic left ventricular diastolic heart failure. The plaintiff was discharged the following afternoon and advised to follow up with nephrology (Tr. 243-77). His discharge instructions noted that he could have a regular diet and perform activities as tolerated (Tr. 245).

On December 14, 2011, the plaintiff was treated at the Good Shepherd Free Clinic. He reported that he ran out of his blood pressure medication. At this time, the plaintiff was in no acute distress, his breath sounds were clear bilaterally, he had a regular heart rate, and he had no edema in his extremities (Tr. 278). Nurse practitioner Sherry C. Hampton prescribed the plaintiff medication and noted that the plaintiff had a diagnosis of hypertension (Tr. 279).

The plaintiff was evaluated by Tony Rana, M.D., on January 20, 2012. The plaintiff reported that he has hypertension, which causes shortness of breath, right hip pain, and obesity (Tr. 280). He reported that excessive ambulation and work causes discomfort in his hip, but noted that his pain was not constant and does not cause limping. He also reported that he is able to function at home, perform activities of daily living, and does mild to moderate amount of intensive work if he has to, but avoids excessive exertion (Tr. 281). Upon examination, the plaintiff's blood pressure was high. He had complete range of motion of all joints in his upper extremities, without loss of muscle power or muscle atrophy (Tr. 282). Dr. Rana assessed that the rest of the plaintiff's lower extremity joints appeared normal (Tr. 282). Dr. Rana pointed out that the plaintiff's lower lumbar examination was normal, but he had a range of motion restriction secondary to his weight. Dr. Rana noted that the plaintiff was otherwise able to bend down and touch his toes and could also extend his low back to approximately 20 degrees (Tr. 282). Dr. Rana also noted that lateral bending was possible with some restriction to approximately 15 to 20 degrees of natural bend on the left and right side. At this time, the plaintiff also had a negative Romberg's and finger to nose testing, as well as normal coordination. Dr. Rana assessed uncontrolled

6

hypertension and noted that the plaintiff was "possibly noncompliant" (Tr. 281).  He further advised the plaintiff to go to the emergency room to get his blood pressure under control and to check his creatinine and kidney functions (Tr. 283).  The plaintiff went to the emergency room as instructed for his blood pressure.  He was given medication and told to follow up with his doctor in a week (Tr. 296).

During the January 20th appointment, Dr. Rana also assessed a complication secondary to hypertension with left ventricular hypertrophy.  He noted that there was no evidence suggestive of acute decompensation of heart failure and further noted that the plaintiff needed to comply with treatment and instructed the plaintiff to keep regular doctor appointments (Tr. 283).  Dr. Rana observed that the plaintiff was producing ample urine, and he "strongly advised" the plaintiff to follow up with his doctors, because he felt that the plaintiff's condition was reversible and could be helped if treated, otherwise, the plaintiff would eventually have to be placed on dialysis or experience cardiac compromise (Tr. 283).

On January 24, 2012, the plaintiff was treated at Piedmont Cardiology Associates as a new patient for hypertension and left ventricular hypertrophy.  The plaintiff denied having any chest discomfort or shortness of breath (Tr. 289).  Upon examination, the plaintiff was in no acute distress and had no tenderness in his spine (Tr. 290).  Shekar Kumar, M.D., noted that the plaintiff had longstanding hypertension and that a previous echocardiogram showed concentric left ventricular hypertrophy.  Dr. Kumar noted that his blood pressure was still elevated and that they would increase the plaintiff's hydralazine.  He noted that the plaintiff was scheduled to see a nephrologist for his renal insufficiency and that he would schedule an exercise echocardiogram, and if there was no ischemia, he assessed that no further cardiac intervention would be needed.  Dr. Kumar talked with the plaintiff about the importance of controlling his blood pressure and also spoke with him about smoking cessation.  Dr. Kumar noted that the plaintiff would continue to follow up with Good Shepherd Free Clinic (Tr. 291).

7

On February 6, 2012, the plaintiff was seen at Carolina Nephrology for abnormal kidney function (Tr. 285). At this time, the plaintiff had a full range of motion in all of his joints and muscles (Tr. 287). Mark D. Purcell, D.O., noted that the plaintiff had uncontrolled hypertension, that he would maximize the plaintiff's hydralazine, and noted that the plaintiff would likely benefit from a diuretic. Given the plaintiff's asymmetric kidneys, Dr. Purcell noted that he would check the plaintiff's renal artery duplex. With regard to the plaintiff's kidney disease, Dr. Purcell noted that he suspected progression, but would need further values in order to stage him (Tr. 288).

On March 8, 2012, the plaintiff saw Dr. Purcell again for abnormal kidney function (Tr. 311-12). At this time, the plaintiff reported that he was feeling well and appeared comfortable and cooperative. His blood pressure was 174/104, and his pulse and breath sounds were normal. With regard to his hypertension, Dr. Purcell noted that he would increase the nitrate and start the plaintiff on a diuretic. He also noted that he suspected progression of late stage III to early stage IV for the plaintiff's kidney disease (Tr. 313).

The plaintiff went to the emergency room for complaints of pain in his thigh on April 25, 2012 (Tr. 326). The physician prescribed pain medication and ordered a hip and femur x-ray (Tr. 327). Although the plaintiff had some tenderness, he was alert, in no acute distress, and he had a normal gait (Tr. 328). The plaintiff reported that his pain was a 4 out of a possible 10 (Tr. 331). The physician noted that it was likely right hip bursitis and made a referral to an orthopedist (Tr. 328). An x-ray of the plaintiff's pelvis from this date showed a possible fracture deformity of the subcapital right femoral neck versus probable osteophytes remaining of the femoral neck, and an x-ray of the right femur showed possible subcapital right femoral neck fracture (Tr. 329).

On April 27, 2012, the plaintiff was treated at Lakelands Orthopedic and Sports Medicine Clinic for right hip discomfort. The plaintiff could not recall any trauma and

8

described the pain as aching.  The plaintiff reported that he was on the Medrol Dosepack from the emergency room for his hip discomfort (Tr. 340).  Douglas Powell, M.D., assessed that the plaintiff was non-tender over his lumbar spine and non-tender to palpitation over the buttocks, hips, thighs, and knees.  Dr. Powell further noted that on the right side, flexion of the plaintiff's right hip beyond 60 to 70 degrees caused slight external rotation, with 0 degrees internal rotation, 20 to 30 degrees external rotation, and 10 to 15 degrees abduction.  On the left side, the plaintiff had near normal range of motion with flexion, internal and external rotation, and abduction.  Based on repeat x-rays, Dr. Powell noted probable impingement, lateral acetabulum, and femoral head stripe wear.  However, he assessed that there was no distinct evidence of avascular changes and noted that the plaintiff did have some osteophytes on the edge of the femoral head articular surface on the right side.  Dr. Powell noted that the plan was to verify the findings on the right hip with an MRI, and possibly a CT.  Dr. Powell also noted that the plaintiff might soon be a candidate for resurfacing or possible osteotomy (Tr. 340).

On May 7, 2012, the plaintiff had an MRI of his right hip that showed moderate sized hip joint effusion without evidence of underlying marrow abnormality; otherwise, it was an unremarkable MRI (Tr. 338).

The plaintiff saw nephrologist William B. Ward, M.D., on May 17, 2012, for issues related to his kidney (Tr. 469).  At this time, the plaintiff's blood pressure was still high, but was coming down, and his creatinine went up to 3 (Tr. 469).  The plaintiff was comfortable and in no acute distress at this appointment.  Dr. Ward noted that the plaintiff has chronic kidney disease with severe hypertension and that he would add an ACE inhibitor cautiously.  Dr. Ward discussed blood pressure control as a way to limit the plaintiff's kidney disease and also mentioned dialysis options (Tr. 470).

On June 21, 2012, state agency physician, Dale Van Slooten, M.D., reviewed the plaintiff's records and assessed that the plaintiff's impairments were not of Listing level

9

severity (Tr. 104). He further assessed that the plaintiff could lift and carry 20 pounds occasionally and ten pounds frequently; stand and/or walk about six hours in an eight-hour workday; and sit about six hours in an eight-hour workday (Tr. 102-103). He further assessed that the plaintiff could frequently balance, stoop, kneel, and crouch; occasionally climb ramps/stairs and crawl; and never climb ladders/ropes or scaffolds (Tr. 103). With regard to environmental limitations, Dr. Van Slooten assessed that the plaintiff should avoid concentrated exposure to extreme temperatures, humidity, hazards, such as heights, and fumes, odors, dusts, gases, and poor ventilation (Tr. 104).

The plaintiff saw Dr. Ward again on July 16, 2012, for kidney issues (Tr. 466). At this time, the plaintiff was comfortable and in no acute distress. Dr. Ward noted that he had added an ACE inhibitor cautiously and that the plaintiff's creatinine was stable. Dr. Ward concluded that the plaintiff should come back for a blood pressure check and then if not better, they would increase the Lisinopril. He instructed the plaintiff to follow up in three months (Tr. 467).

On September 9, 2012, the plaintiff presented to the emergency room for right hip pain, and the discharge note stated that he should take Tylenol as needed and follow up with his physician (Tr. 405).

The plaintiff returned to the emergency room on September 18, 2012, for hip and thigh pain and a medication refill. The plaintiff reported that he needed a hip replacement and blood pressure medication, but could not afford them (Tr. 357). The history portion of the note stated that the plaintiff has a history of hypertension, which had been treated, but that the plaintiff was noncompliant with treatment and had not had medication in two to three days (Tr. 358). The plaintiff was noted as having a normal gait at the time. Apart from right hip tenderness and pain with active range of motion, the examination of the plaintiff's lower extremity was normal. The doctor's note stated that the

10

plaintiff was going to get blood pressure medication in the morning and that the plaintiff was asymptomatic except for hip pain (Tr. 359).

On October 8, 2012, the plaintiff returned to Dr. Ward for kidney issues (Tr. 463). The plaintiff was comfortable and in no acute distress (Tr. 464). Dr. Ward noted that they discussed blood pressure control for more protection from progression and heart attack and stroke risk (Tr. 464). With regard to the plaintiff's blood pressure, Dr. Ward decided to maximize the hydralazine and noted that the plaintiff would likely benefit from a diuretic (Tr. 464).

On October 12, 2012, the plaintiff had a motor vehicle accident and was treated at the emergency room for a contusion on his right hip, lumbar strain, and a muscle tension headache. He was given medication, discharged, and instructed to follow up with his family physician (Tr. 344). At this time, although the plaintiff had right hip discomfort, there was no bruising or deformity, and he had a full range of motion. The plaintiff was also noted as having a normal gait (Tr. 349). A preliminary review of the plaintiff's x-rays showed no fracture of the lumbar spine, right hip, or pelvis (Tr. 350, 353). The x-rays showed evidence of degenerative changes in the hips bilaterally.

On November 15, 2012, the plaintiff received a medication refill from Good Shepherd Free Clinic, but was not examined (Tr. 366). The note stated that the refills ended on February 12, 2013, and that the plaintiff would not get any additional refills unless he was seen in clinic (Tr. 368).

On January 28, 2013, the plaintiff again saw Dr. Ward for issues related to his kidneys (Tr. 460). The plaintiff reported that his blood pressure was much better, his blood pressure medications were working, and it was now controlled. The plaintiff further reported that he had a hip fracture and was waiting for therapy (Tr. 460). At this appointment, the plaintiff appeared comfortable and in no acute distress (Tr. 461). Dr. Ward assessed that

the plaintiff's creatinine was a bit better, that his blood pressure had been better recently, that he was on an ACE inhibitor, and he should follow up in three months (Tr. 461).

The plaintiff went to the emergency room on February 4, 2013, with complaints of hip pain (Tr. 377). There was no new medication or changes in the plaintiff's home medications, and his followup care instructions noted that the plaintiff should rest and apply ice or heat (Tr. 380).

The plaintiff went to the Good Shepherd Free Clinic on March 21, 2013, for refills of his blood pressure medication. At that time, he was told to follow up in six months (Tr. 365). On March 28, 2013, the plaintiff was admitted to the hospital for kidney disease and was discharged the same day (Tr. 370-71, 413). The note stated that he was diagnosed with chronic kidney disease stage III (moderate) (Tr. 371-72).

On April 8, 2013, the plaintiff was treated at a nephrology group for abnormal kidney function (Tr. 457). Dr. Ward noted again that the plaintiff's creatinine was a bit better, that his blood pressure has been better lately, and he was on an ACE inhibitor (Tr. 459). Dr. Ward noted that the plaintiff should follow up in four months (Tr. 458).

On August 16, 2013, the plaintiff was seen at a pain management group for right hip pain, upon referral by his attorney. The report noted that he was in the process of applying for disability and had his hearing soon. The plaintiff reported hip pain that started about ten years ago, but noted that it had gotten worse in recent years and that he used crutches to ambulate. He rated his pain as a nine out of ten worsened by prolonged sitting, standing, or walking (Tr. 485). Upon exam, the plaintiff was alert, oriented, and on time. He described his pain as sharp, aching, throbbing, and burning in the right hip, lower back and buttock, with occasional extension to the thigh and leg. Carol W. Burnette, M.D., noted that the plaintiff's gait was slow and antalgic, and he was using crutches (Tr. 486). The plaintiff's straight leg raising tests produced some pulling discomfort in the hamstrings bilaterally, but with no definite radicular symptoms. With regard to the plaintiff's right hip,

12

Dr. Burnette noted mild tenderness to palpitation, with a restriction in flexion and rotation, and trace pedal edema. She further observed that the range of motion in the plaintiff's right knee and ankle were within normal limits. Dr. Burnette assessed chronic right sided hip, intermittent back and leg pain, with a history of possibly congenital dysplasia of the acetabulum, signs of osteoarthritis and ongoing hip pain with painful ambulation. She also noted obesity, enlarged heart, hypertension, and stage IV kidney disease. Dr. Burnette noted that hopefully the plaintiff would be able to follow up with orthopedics for surgery for his hip, and she encouraged weight loss. In terms of the plaintiff's work ability, she noted that he would not likely be able to maintain gainful employment. Dr. Burnette further opined that the plaintiff would need frequent rest breaks and allowance to alternate sitting, reclining, and moving as needed. She also stated that the plaintiff would be restricted to lifting no more than ten pounds occasionally (Tr. 487). Dr. Burnette also assessed that the plaintiff's pain would interfere with his ability to maintain concentration and that the plaintiff could never perform postural movements, but could occasionally, reach, handle, and feel, and rarely push/pull (Tr. 491, 494-95). She also assessed that the plaintiff should rarely or never be exposed to hazards such as heights and moving machinery and that the plaintiff was incapable of even low stress jobs (Tr. 495-96).

On September 6, 2013, Dr. Powell completed a Listing questionnaire regarding the plaintiff, where he checked that the plaintiff met the requirements of Listing 1.02A (Major Dysfunction of a Joint) due to issues with his right hip (Tr. 497-98). Dr. Powell reiterated that the plaintiff had gross deterioration of the hip and suffered from femoral head deterioration, femoroacetabular impingement, and was unable to walk without two canes. He noted that the plaintiff would be a candidate for either resurfacing or possibly osteotomy. Specifically, Dr. Powell stated, "The head continues to deteriorate, a more recent scan would see an increase in arthritic change. Principal problem is femoroacetabular impingement plus weight" (Tr. 497-98). Dr. Powell noted that, at that time, the plaintiff was

13

capable of "sit-down" work only, but "even that would be difficult with the amount of deterioration we see in the hip" (Tr. 498).

Following the administrative hearing, the plaintiff had a consultative examination with Susan J. Tankersley, M.D., on September 18, 2013 (Tr. 500-504). The plaintiff reported that his hip problems began in 2001 and that the pain had worsened over time. Dr. Tankersley noted that the plaintiff's hip has been worked up extensively. In reviewing the records, Dr. Tankersley pointed out that, although Dr. Burnett noted a possible resurfacing or osteotomy, the MRI from May 2012 was unremarkable except for a large joint effusion (Tr. 500). An x-ray from this date of the plaintiff's hip showed no acute bony trauma (Tr. 499).    Dr. Tankersley also noted that the plaintiff ambulated with crutches, but that he started doing this of his own volition, that he was not taking any pain medications for his hip (including over the counter medication), and had he never had physical therapy of any sort. The plaintiff reported that he could stand or walk one mile at most before he needed to sit or lie down. He reported that he spent most of the day in bed with his leg propped up. The plaintiff denied a history of lower back pain (Tr. 500). The plaintiff reported that he was diagnosed with hypertension in 2006 (Tr. 501). He explained that he did not start taking medication for this condition until 2011, when he was admitted to the hospital for shortness of breath. A stress test taken at that time was benign. The plaintiff further reported that an echo[cardiogram] identified an enlarged heart, but that he did have good function. The plaintiff reported that it was his hip pain, and not his shortness of breath, that stopped his exercise. Dr. Tankersley noted that the plaintiff was diagnosed with chronic kidney disease and had been followed by a nephrologist. The plaintiff reported that he last saw his nephrologist the month prior and that the nephrologist told him that his renal function remained stable, and he had stage III chronic kidney disease (Tr. 501).

Upon examination, the plaintiff's heart had a regular rate and rhythm, and he had full strength and range of motion in his upper extremities. With regard to his lower

14

extremities, Dr. Tankersley observed that there was no muscle wasting or effusion, and his left lower extremity was largely unremarkable (Tr. 502). On the right side, Dr. Tankersley noted that the plaintiff had some reduced range of motion in his right hip – ten degrees adduction, 25 degrees abduction, 60 degrees flexion, internal rotation 30 degrees, and external rotation 25 degrees. The plaintiff's right knee range of motion was reduced to -5 degrees on extension and 105 degrees on flexion, but his ankle range of motion was intact (Tr. 502). Although the plaintiff had some thoracic spine kyphosis and mild scoliosis, he maintained a full range of motion in both his cervical and lumbar spines (Tr. 503).

Dr. Tankersley assessed that the plaintiff could lift 20 pounds occasionally and up to ten pounds frequently; carry up to ten pounds occasionally; sit seven hours in an eight-hour day; stand two hours in an eight-hour day; and walk one hour in an eight-hour day (Tr. 508-509). Dr. Tankersley also assessed that the plaintiff could frequently reach (other than overhead), handle, finger, feel, and push and pull; occasionally reach overhead; occasionally operate foot controls with his right foot, but could frequently operate foot controls with his left foot (Tr. 510). With regard to postural activities, Dr. Tankersley assessed that the plaintiff could occasionally stoop, but never climb, balance, kneel, crouch, and crawl (Tr. 511). Dr. Tankersley also assessed that the plaintiff should never be exposed to unprotected heights, extreme cold, or vibrations, and could occasionally be exposed to moving mechanical parts, operating motor vehicles, humidity and wetness, dust, odors, fumes, and pulmonary irritants and extreme heat (Tr. 512). Dr. Tankersley also noted that the plaintiff could shop, travel, and use public transportation (Tr. 513).

Dr. Tankersley noted that whatever the pathology was in the plaintiff's hip, it was subtle and that the plaintiff might want to see an orthopedic hip specialist to get more insight into the pathology. The doctor also noted that she did have issues with the fact that the plaintiff took no pain medications – over the counter or otherwise – and that the plaintiff might have some return to function with even minimal analgesia. As a rule, and in her

experience, Dr. Tankersley noted that patients with severe hip pain actively seek pain relief of any sort. She also observed that the plaintiff sat comfortably throughout his interview (Tr. 503). Dr. Tankersley opined that the plaintiff's employment would be limited to sedentary jobs largely based on his other medical conditions, as opposed to his hip pathology (Tr. 503).

### Administrative Hearing Testimony

The plaintiff completed the twelfth grade and testified that he left his last position as a custodian because he was laid off (Tr. 62-63). He further testified that he received unemployment benefits from 2009 through 2011 (Tr. 63). The plaintiff reported that he sometimes drives and can vacuum (Tr. 82). He also noted that he could lift ten pounds comfortably (Tr. 84). The plaintiff testified that the problem that gives him the most trouble was his chronic hip pain and that he uses crutches to ambulate. He further testified that he is most comfortable when lying on his side (Tr. 64). With regard to his use of crutches, the plaintiff testified that he obtained the crutches on his own and not through a prescription or the recommendation of a physician (Tr. 68). He testified that he is 5'10" tall and weighs 300 pounds, which was down from 400 pounds. The plaintiff lost the weight from 2007 to the present (Tr. 74).

Apart from quick bathroom trips, the plaintiff testified that he had no other symptoms with regard to his kidney issues. With regard to heart issues, the plaintiff testified that he did not have any chest pain (Tr. 73). The plaintiff is on medication for hypertension. He is not on medication for his hip pain due to his inability to afford prescription pain medication. As a direct result of being uninsured and unemployed, the plaintiff testified that he has no funds to reimburse the orthopaedist for treatment. The plaintiff testified that he is unable to take over the counter analgesics due to his chronic kidney disease (Tr. 70). The plaintiff testified that he suffers from chronic fatigue, insomnia, itching, dizzy spells, nausea, pain in his right hip, hot and cold spells, headaches, loss of appetite, swelling in

16

his ankles, and difficulty concentrating  (Tr. 78-81).  On a scale of one to ten, the level of

pain he endures on a daily basis is a nine (Tr. 81).  The plaintiff testified that without the use

of his crutches, he would not be able to stand for longer than ten minutes and was unable

to life anything above ten pounds (Tr. 82-83).

       The ALJ asked the vocational expert to assume an individual of the plaintiff's

age, education, and experience, who was limited to sedentary work that does not involve

foot-control operations, involves only occasional climbing of stairs, balancing, stooping,

kneeling, crouching, and crawling, but no climbing of ladders, ropes, and scaffolds; and no

exposure to excessive hydration and hazards such as unprotected heights (Tr. 85).  The

vocational expert testified that such a hypothetical person would be able to perform

representative occupations that exist in significant numbers in the national economy such

as order clerk, cuff folder, and addresser (Tr. 86).

## ANALYSIS

       The plaintiff was 39 years old on his amended alleged disability onset date

(November 3, 2011).   He completed the twelfth grade and has no past relevant work

experience (Tr. 62).  The plaintiff argues that the ALJ erred by (1) improperly rejecting all

of the opinions of record from examining and treating medical sources; (2)  making an

unsupported determination of his credibility; and (3)  failing to account for the additional

functional limitations caused by his obesity in the residual functional capacity ("RFC")

determination (pl. brief 1-2).

### *Medical Opinions*

       The plaintiff first argues that the ALJ erred by rejecting all of the opinions of

record from examining and treating medical sources (pl. brief 9-13).  The regulations require

that all medical opinions in a case be considered, 20 C.F.R. §§ 404.1527(b), 416.927(b),

and, unless a treating source's opinion is given controlling weight, weighed according to the

following non-exclusive list: (1) the examining relationship; (2) the length of the treatment

relationship and the frequency of the examinations; (3) the nature and extent of the treatment relationship; (4) the evidence with which the physician supports his opinion; (5) the consistency of the opinion; and (6) whether the physician is a specialist in the area in which he is rendering an opinion. *Id.* §§ 404.1527(c)(1)-(5), 416.927(c)(1)-(5). *See also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005). However, statements that a patient is "disabled" or "unable to work" or similar assertions are not medical opinions. These are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5.

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). Social Security Ruling ("SSR") 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. 1996 WL 374188, at *5. As stated in SSR 96-2p:

> [A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. §§ 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* at *4.

### *Dr. Powell*

The plaintiff first argues that the ALJ erred in giving only "moderate weight" to the opinion of his treating orthopedist, Dr. Powell (pl. brief 12). As more fully set forth above, on September 6, 2013, Dr. Powell completed a Listing questionnaire and checked

18

that the plaintiff met the requirements of Listing 1.02A (Major Dysfunction of a Joint) due to issues with his right hip. Dr. Powell noted that, at that time, the plaintiff was capable of "sit-down" work only, but "even that would be difficult with the amount of deterioration we see in the hip" (Tr. 497-98). The ALJ gave the opinion "moderate weight," noting that the opinion was vague and inconsistent with the other evidence of record, including a May 2012 MRI of the hip that showed moderate effusion without any other abnormality (Tr. 23; *see* Tr. 338).

Significantly, as noted by the Commissioner, the plaintiff himself does not argue that his hip impairment meets Listing level severity as assessed by Dr. Powell. Further, although the plaintiff argues that all of his treating physicians "confirm that [he] is unable to maintain gainful employment" (pl. brief 11), Dr. Powell in fact assessed that, although it would be difficult, the plaintiff was capable of "sit-down" or sedentary work (Tr. 498).

Furthermore, the record supports the ALJ's finding that Dr. Powell's opinion was inconsistent with the other evidence of record, in addition to the May 2012 MRI. Specifically, the plaintiff was noted as having a normal gait in April 2012 (Tr. 328). In September 2012, the plaintiff presented to the emergency room for right hip pain, and the discharge note stated that he should only take Tylenol (Tr. 405). A week later, the plaintiff was noted as having a normal gait (Tr. 359). In October 2012, although his right hip had discomfort, there was no bruising or deformity, and he had a full range of motion (Tr. 349). The plaintiff was also noted as having a normal gait (Tr. 349). Thereafter, on February 4, 2013, although the plaintiff went to the emergency room with complaints of hip pain, he was discharged that day, with no new medications, and his follow up care instructions noted only that he should rest and apply ice or heat (Tr. 377, 380). Moreover, Dr. Tankersley, as late as September 2013, examined the plaintiff and noted that pathology in his hip was only subtle (Tr. 500-503). Although the plaintiff used crutches, he testified that these were

neither prescribed nor recommended by any physician, and he used them of his own volition (Tr. 68, 500). The plaintiff also reported that he could walk up to a mile "at best" before needing to sit or lie down (Tr. 500). Further, in January 2012, the plaintiff told Dr. Rana that he could perform a mild to moderate amount of intensive work if he has to (Tr. 281). With regard to his other alleged impairments apart from his hip, in September 2012, the physician noted that the plaintiff was asymptomatic apart from his hip (Tr. 359). Further, in March 2013, the plaintiff's creatinine and blood pressure were noted as improved (Tr. 459). The plaintiff further testified that he had no symptoms related to his other alleged impairments (Tr.73).

Further, substantial evidence supports the ALJ's finding that Dr. Powell's opinion was "vague" (Tr. 23; *see* Tr. 497-98). Courts in this circuit have recognized that checkbox forms such as the one at issue here have "limited probative value." *See Freeman v. Colvin*, C.A. No. 7:14cv00199, 2015 WL 5056734, at *4 (W.D. Va. Aug. 26, 2015) (citing *Leonard v. Astrue*, C.A. No. 2:11cv00048, 2012 WL 4404508, at *4 (W.D. Va. Sept. 25, 2012) and *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir.1993) ("Such check-the-box assessments without explanatory comments are not entitled to great weight, even when completed by a treating physician.")). *See also* 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3) (the more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight an ALJ gives that opinion).

In his reply brief, the plaintiff argues that the Commissioner has offered *post-hoc* rationalization not included in the ALJ's decision (pl. reply 6-7). *See Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir.2003) ("[G]eneral principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ."). The plaintiff contends that "the May 2012 MRI is the only reason given by the ALJ to limit the weight assigned to the opinion of Dr. Powell," and thus the court should not consider the Commissioner's "entirely new justifications" (pl.

reply 6). The plaintiff is mistaken. The ALJ gave Dr. Powell's opinion moderate weight because it was inconsistent with the other evidence of record and because it was vague (Tr. 23). "Attempting to offer a *post hoc* conclusion, however, is not analogous to the situation here, where the Commissioner is merely attempting to point to support in the record for the ALJ's finding." *Heeman v. Colvin*, C.A. No. 2:13-3607-TMC, 2015 WL 5474679, at *3 (D.S.C. Sept. 16, 2015). Furthermore,

> [W]here the magistrate judge in her Report points to additional evidence in the record supporting the ALJ's opinion, the magistrate judge is not applying a *post hoc* rationale. Rather, the magistrate judge is simply noting that the substantial evidence relied upon by the ALJ is not inconsistent with other evidence in the record. *Hodgson v. Barnhart*, C/A No. 5:05-cv-14, 2006 WL 5527016, at *4 (N.D.W.Va. Mar.27, 2006). *See also George-Douglas v. Comm'r*, C/A No. 12-2729, 2013 WL 4242372, at *2 (D.Md.Aug.13, 2013) (holding that offering *post hoc* conclusion is not analogous to the Commissioner's pointing to support in the record for the ALJ's finding); *Wells v. Astrue*, C/A No. 3:10-cv-721, 2012 WL 966660, at *2-3 (E.D.Va. Mar.21, 2012) (noting that this type of argument "misinterprets both the Magistrate's rationale, as well as the standard for judicial review"). The magistrate judge merely was referring to evidence in the record which she determined was substantial evidence to support the AL's decision, and the court finds no error.

*Id.*

Because the ALJ articulated appropriate reasons for not giving Dr. Powell's opinion controlling weight, and because substantial evidence supports his assessment, this allegation of error is without merit.

### Dr. Burnette

The plaintiff also argues that the ALJ erred in giving "little weight" to the opinion of examining physician Dr. Burnette (pl. brief 12). As more fully set forth above, in August 2013, the plaintiff was seen by Dr. Burnette's pain management group for right hip pain upon referral by his attorney. Dr. Burnette noted that the plaintiff would not likely be

21

able to maintain gainful employment.  Dr. Burnett further opined that the plaintiff would need frequent rest breaks and allowance to alternate sitting, reclining, and moving as needed. She also stated that the plaintiff would be restricted to lifting no more than ten pounds occasionally (Tr. 487).  Dr. Burnette also assessed that the plaintiff's pain would interfere with his ability to maintain concentration and that the plaintiff could never perform postural movements, but could occasionally, reach, handle, and feel, and rarely push/pull (Tr. 491, 494-95).  She also assessed that the plaintiff should rarely or never be exposed to hazards such as heights and moving machinery and that the plaintiff was incapable of even low stress jobs (Tr. 495-96).

        The ALJ gave Dr. Burnette's opinion "little weight," noting that the extreme limitations placed on the plaintiff found little support in the record.  For example, the ALJ noted that the plaintiff's severe impairments could not reasonably be expected to prevent him from working even "low stress" jobs  or tolerating only rare exposure to noise (Tr. 24). Further, with regard to the manipulative limitations imposed by Dr. Burnette, the consultative examination by Dr. Tankersley showed the plaintiff had no abnormalities in his hands (Tr. 24; *see* Tr. 507).  The ALJ further noted that the exertional limitations were inconsistent with the other evidence of record, such as the May 2012 MRI of the hip that showed moderate effusion without any other abnormality (Tr. 24).  As discussed above with regard to Dr. Powell's opinion, the other benign findings of record also weigh against Dr. Burnette's extreme limitations, including the plaintiff's normal gait (Tr. 328, 349, 359), the plaintiff's own testimony that he could walk a mile at most before having to sit down, and the plaintiff's report to Dr. Rana that he could perform a mild to moderate amount of intensive work if he has to (Tr. 281).  Lastly, the ALJ noted that Dr. Burnette's statement that the plaintiff would not be likely be able to maintain gainful employment was not an assessment of the plaintiff's RFC but was rather a conclusory statement of disability, an issue that is reserved for the Commissioner (Tr. 24). *See* SSR 96-5p, 1996 WL 374183, at *5 (statements that

a patient is "disabled" or "unable to work" or similar assertions are not medical opinions but rather are administrative findings reserved for the Commissioner's determination).  Based upon the foregoing, the ALJ adequately articulated the basis for his assessment of Dr. Burnette's opinion, and substantial evidence supports his analysis.

### Dr. Tankersley

The plaintiff also argues that the ALJ erred in giving Dr. Tankersley's opinion "moderate weight" (pl. brief 12).  As more fully set forth above, Dr. Tankersley performed a consultative examination of the plaintiff on September 18, 2013 (Tr. 500-504).  Upon examination, the plaintiff's heart had a regular rate and rhythm, and he had full strength and range of motion in his upper extremities.  With regard to his lower extremities, Dr. Tankersley observed that there was no muscle wasting or effusion, and his left lower extremity was largely unremarkable (Tr. 502).  On the right side, Dr. Tankersley noted that the plaintiff had some reduced range of motion in his right hip – ten degrees adduction, 25 degrees abduction, 60 degrees flexion, internal rotation 30 degrees, and external rotation 25 degrees.  Although the plaintiff had some thoracic spine kyphosis and mild scoliosis, he maintained a full range of motion in both his cervical and lumbar spines (Tr. 502-503).  Dr. Tankersley noted that she had issues with the fact that the plaintiff took no pain medications – over the counter or otherwise – and that the plaintiff might have some return to function with even minimal analgesia.  She also observed that the plaintiff sat comfortably throughout his interview.  Dr. Tankersley opined that the plaintiff's employment would be limited to sedentary jobs largely based on his other medical conditions, as opposed to his hip pathology (Tr. 503).

The ALJ gave Dr. Tankersley's opinion "moderate weight" (Tr. 23).  The ALJ noted Dr. Tankersley's assessment that the plaintiff should be limited to sedentary work and could lift up to ten pounds frequently and 20 pounds occasionally, with postural and environmental limitations (Tr. 23; see Tr. 500-503).  The ALJ noted that this assessment

23

was consistent with the May 2012 MRI of the plaintiff's hip showing only effusion and no abnormality (Tr. 23; *see* Tr. 338). This assessment is also very similar to the RFC finding of the ALJ (*see* Tr. 20). However, the ALJ noted that Dr. Tankersley's limitation with regard to sitting for no more than three minutes at a time was not supported by Dr. Tankersley's own observations of the plaintiff at the examination (Tr. 23; *see* Tr. 509), where Dr. Tankersley observed that the plaintiff was able to sit comfortably throughout the interview (Tr. 23; *see* Tr. 503). Here, the ALJ adequately articulated the basis for his assessment of Dr. Tankersley's opinion, and it is supported by substantial evidence.

### State Agency Physician

The ALJ gave "moderate weight" to the opinion of state agency medical consultant Dr. Van Slooten, who reviewed the evidence in June 2012 and found that the plaintiff could perform light work with some postural and environmental limitations (Tr. 102-104). The ALJ noted that Dr. Van Slooten had the benefit of reviewing a large cross section of the medical evidence and was familiar with Social Security disability evaluation (Tr. 23). However, the ALJ reduced the RFC to sedentary work based on the plaintiff's combination of impairments, which the ALJ felt Dr. Van Slooten did not adequately consider (Tr. 23). The ALJ was required to consider the state agency physician assessments as opinion evidence. *See* 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i) ("State agency medical and psychological consultants . . . are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation. Therefore, administrative law judges must consider findings and other opinions of State agency medical and psychological consultants . . . as opinion evidence, except for the ultimate determination about whether you are disabled."). *See* SSR 96-6p, 1996 WL 374180, at *3 ("In appropriate circumstances, opinions from State agency medical . . . consultants . . . may be entitled to greater weight than the opinions of treating or examining sources."); *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir.1984) ("[T]he testimony of a

24

non-examining, non-treating physician should be discounted and is not substantial evidence when totally contradicted by other evidence in the record. . . . [W]e have also ruled that the testimony of a non-examining physician can be relied upon when it is consistent with the record.") (citations omitted).

Based upon the foregoing, the undersigned finds that the ALJ did not err in his consideration of the opinion evidence.

### Credibility

The plaintiff next argues that the ALJ failed to properly assess his credibility (pl. brief 13-16). The Fourth Circuit Court of Appeals has stated as follows with regard to the analysis of a claimant's subjective complaints:

> [T]he determination of whether a person is disabled by pain or other symptoms is a two-step process. First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and *which could reasonably be expected to produce the pain or other symptoms alleged*. . . . It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated.

*Craig v. Chater*, 76 F.3d 585, 594-95 (4th Cir. 1996) (citations and internal quotation marks omitted) (emphasis in original). In *Hines v. Barnhart*, 453 F.3d 559 (4th Cir. 2006), a Fourth Circuit Court of Appeals panel held, "Having met his threshold obligation of showing by objective medical evidence a condition reasonably likely to cause the pain claimed, [the claimant] was entitled to rely exclusively on subjective evidence to prove the second part of the test, i.e., that his pain [was] so continuous and/or severe that it prevent[ed] him from working a full eight-hour day." 453 F.3d at 565. However, the court in *Hines* also acknowledged that "'[o]bjective medical evidence of pain, its intensity or degree (i.e., manifestations of the functional effects of pain such as deteriorating nerve or muscle tissue,

muscle spasm, or sensory or motor disruption), if available should be obtained and considered.'" *Id.* at 564 (quoting SSR 90-1p, 1990 WL 300812).

> The court further acknowledged:

>> While objective evidence is not mandatory at the second step of the test, "[t]his is not to say, however, that objective medical evidence and other objective evidence are not crucial to evaluating the intensity and persistence of a claimant's pain and the extent to which it impairs her ability to work. They most certainly are. Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers."

*Id*. at 565 n.3 (quoting *Craig*, 76 F.3d at 595). *See Johnson v. Barnhart*, 434 F.3d 650, 658 (4th Cir. 2005); 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2) ("We must always attempt to obtain objective medical evidence and, when it is obtained, we will consider it in reaching a conclusion as to whether you are disabled.  However, we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements."); SSR 96-7p, 1996 WL 374186, at *6 ("[T]he absence of objective medical evidence supporting an individual's statements about the intensity and persistence of pain or other symptoms is only one factor that the adjudicator must consider in assessing an individual's credibility and must be considered in the context of all the evidence.").

A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4). Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's

credibility." *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001). Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." 1996 WL 374186, at *4. Furthermore, it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight." *Id.*

The factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

(1)    the individual's daily activities;

(2)    the location, duration, frequency, and intensity of the individual's pain or other symptoms;

(3)    factors that precipitate and aggravate the symptoms;

(4)    the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

(5)    treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

(6)    any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

(7)    any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.* at *3. *See* 20 C.F.R. §§ 404.1529(c), 416.929(c).

At the first step of the consideration of the plaintiff's pain, the ALJ found that the plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms. However, at the second step, the ALJ found that the plaintiff's statements concerning the intensity, persistence, and limiting effects of those symptoms were not entirely credible (Tr. 20).

27

In making this finding at the second step, the ALJ first pointed out that the plaintiff's employment at his last job, where he worked as a custodian, ended for reasons unrelated to his impairment, which undercut his claims that he could not work at all (Tr. 20; *see* Tr. 62-63). Next, the ALJ noted that the plaintiff was not fully compliant with his treatment, which also belied his claims of debilitating limitations (Tr. 20). This finding is supported by substantial evidence in the record. In January 2012, Dr. Rana noted that the plaintiff was "possibly non-compliant" (Tr. 281) and later warned the plaintiff to comply with his treatment and keep regular doctor's appointments (Tr. 283). Later, on September 18, 2012, a treatment note stated that the plaintiff was noncompliant and had not taken his blood pressure medication in two to three days (Tr. 358). Further, the ALJ noted that the plaintiff did not take over the counter or prescription medication, despite his claims of debilitating limitation (Tr. 20). The plaintiff testified that he could not afford prescription medication and that he could not take the over the counter medication due to his kidneys (Tr. 69-70). Accordingly, the plaintiff argues that it was error for the ALJ to consider this factor (pl. brief 15-16). However, the plaintiff was able to get prescription medication, including pain medication, from the free clinic and emergency room (Tr. 278-79, 327, 361, 365-366). Further, he was given Extra Strength Tylenol for hip pain during a visit to the emergency room (Tr. 360), and the hospital instructed him to take Tylenol as needed upon one of his discharges (Tr. 405). Moreover, Dr. Tankersley noted that she had "some issues" issues with the fact that the plaintiff took no pain medications – over the counter or otherwise – and that the plaintiff might have some return to function with even minimal analgesia. As a rule, and in her experience, Dr. Tankersley noted that patients with severe hip pain actively seek pain relief of any sort (Tr. 20-21; *see* Tr. 503). Based upon the foregoing, the undersigned finds that the ALJ did not err in considering that the plaintiff's failure to take even over the counter medication for pain despite his claims of debilitating limitations undercut his credibility with regard to the severity of his alleged symptoms (Tr.

20-21).  *See* 20 C.F.R. §§ 404.1529(c), 416.929(c) (factors to  be considered by an ALJ when assessing the credibility of an individual's statements includes the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms).  In any event, the plaintiff's usage of medication was only one of several factors in the ALJ's credibility analysis.

In addition, the ALJ found that the objective medical findings of record failed to provide support for the plaintiff's claims of debilitating limitations.  For example, the MRI of the plaintiff's hip from May 2012 showed only joint effusion with no other abnormality (Tr. 22; *see* Tr. 338), and an x-ray of the plaintiff's hip in September 2013 showed no acute abnormality (Tr. 23; *see* Tr. 499).  In addition, the plaintiff was noted as having a normal gait in April, September, and October 2012 (Tr. 328, 349, 359).  Upon examination by Dr. Rana in January 2012, the plaintiff had complete range of motion of all joints in his upper extremities, without loss of muscle power or muscle atrophy, his right hip had minimal restriction of flexion to about 100 degrees, and Dr. Rana assessed that the rest of the plaintiff's lower extremity joints appeared normal (Tr. 21; *see* Tr. 282).  Dr. Rana pointed out that the plaintiff's lower lumbar examination was normal, but he had a range of motion restriction secondary to his weight.  Dr. Rana noted that the plaintiff was otherwise able to bend down and touch his toes and could also extend his low back to approximately 20 degrees (Tr. 282).  Moreover, Dr. Tankersley in September 2013 examined the plaintiff and noted that pathology in the plaintiff's hip was only subtle (Tr. 500-503).

The ALJ further noted that the plaintiff's own reported activities weighed against his claims of debilitating limitations (Tr. 24).  For example, the plaintiff reported that he could stand or walk one mile at most before he needed to sit or lie down (Tr. 500); he can vacuum and sometimes drive (Tr. 82); and he reported to Dr. Rana that he is able to function at home, perform activities of daily living, and does mild to moderate amount of intensive work if he has to, but avoids excessive exertion (Tr. 281).

29

Importantly, as noted by the Commissioner, the ALJ found many of the plaintiff's allegations credible and limited him to a reduced range of sedentary work, with no foot controls and postural and environmental limitations (Tr. 20).  The undersigned finds that the ALJ did not err in his consideration of the plaintiff's symptoms when determining his work capacity, and the RFC finding is supported by substantial evidence.

### Obesity

Lastly, the plaintiff argues that the ALJ failed to properly consider in the RFC assessment the additional functional limitations caused by his obesity (pl. brief 16-17). Social Security Ruling 96-8p provides in pertinent part:

> The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraph (b), (c), and (d) of 20 C.F.R. §§ 404.1545 and 416.945. Only after that may RFC be expressed in terms of the exertional level of work, sedentary, light, medium, heavy and very heavy.

SSR 96-8p, 1996 WL 374184, at *1.  The ruling further provides:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations).  In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record.  The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

Id. at *7 (footnote omitted).  Further, "[t]he RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." Id.  Moreover, "[t]he RFC assessment must always consider and address medical source opinions.  If the

RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." *Id.*

Social Security Ruling 02-1p recognizes that obesity can cause limitations of function in sitting, standing, walking, lifting, carrying, pushing, pulling, climbing, balancing, stooping, crouching, manipulating, as well as the ability to tolerate extreme heat, humidity, or hazards. SSR 02-1p, 2000 WL 628049, at *6. These issues must be considered in assessing a claimant's RFC. *Id.* The Ruling states that "individuals with obesity may have problems with the ability to sustain a function over time" and that "[i]n cases involving obesity, fatigue may affect the individual's physical and mental ability to sustain work activity." *Id.* The Ruling also states:

> The combined effects of obesity with other impairments may be greater than might be expected without obesity. For example, someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from the arthritis alone.

*Id.* Further, "[a]s with any other impairment, we will explain how we reached our conclusions on whether obesity caused any physical or mental limitations." *Id.* at *7.

The plaintiff concedes that the ALJ correctly noted the rules and regulations regarding the analysis of obesity, but argues that the ALJ did not expressly discuss what additional limitations were provided in the RFC to account for his obesity (pl. brief 17). However, the plaintiff does not point to any additional limitation that is supported by the record with regard to his obesity that is not accounted for by the reduced range of sedentary work found by the ALJ.

The ALJ specifically found the plaintiff's obesity to be a severe impairment (Tr. 18). Further, in the Listing analysis at Step Two, the ALJ noted that, while there is no specific medical listing regarding obesity, he had evaluated the impairment pursuant to the guidelines set forth in SSR 02-1p (Tr. 19). The ALJ stated, "I have fully considered obesity in the context of the overall record evidence in making the residual functional capacity

determination below" (Tr. 19). Then, in the RFC analysis itself, the ALJ noted that the plaintiff's Body Mass Index ("BMI") was 58.2,[3] which put him at Level III, or extreme, obesity (Tr. 23). The ALJ further noted that SSR 02-1p provides that obesity can cause functional limitations, manipulative limitations, limitations in tolerance of environmental factors, and social limitations (Tr. 23). Lastly, the ALJ found that the plaintiff's Level III obesity "causes significant limitation in the claimant's ability to perform basic work activities" (Tr. 23).

In his reply (pl. reply 8), the plaintiff notes that Dr. Powell stated that the plaintiff's "[p]rincipal problem is femoroacetabular impingement **plus weight** . . . . At present time, he really is capable of sit-down work only. Even that would be difficult with the amount of deterioration we see in the hip" (Tr. 498 (emphasis added)). Importantly, the ALJ limited the plaintiff to a reduced range of sedentary work with no foot controls and postural and environmental limitations. The undersigned agrees with the Commissioner that the ALJ properly considered the plaintiff's obesity in the context of the overall record evidence in making this RFC assessment. The plaintiff cites no credibly established limitations related to his obesity for which the ALJ failed to account (pl. brief 16-17). *See Clark v. Astrue*, C.A. No. 11-2585-MGL-JDA, 2012 WL 6849874, at *10 (D.S.C. Dec. 14, 2012) ("Critically, Plaintiff has offered no argument as to what additional limitations she suffers as a result of her obesity beyond those that the ALJ acknowledged."), *Report & Recommendation adopted by* 2013 WL 145037 (D.S.C. Jan. 14, 2013). Thus, the plaintiff " fails to demonstrate how any additional discussion [of his obesity] could have produced a different result," *Conner v. Astrue*, No. 4:10–2905–TER, 2012 WL 715062, at *5 (D.S.C. Mar. 1, 2012), and, therefore, the plaintiff has failed to demonstrate any error by the ALJ

---

[3]The ALJ computed the plaintiff's BMI based on a height of 5'2" and weight of 318 pounds (Tr. 23), citing Dr. Tankersley's report (Tr. 502), which was the most recent report in the record. However, the plaintiff testified at the hearing that he was 5'10" tall (Tr. 74), and Dr. Burnette also reported that the plaintiff was 5'10" tall (Tr. 486). Dr. Rana documented the plaintiff's height as 5' 8½" (Tr. 282).

with respect to his obesity was anything other than harmless. *See Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir.1994) (affirming denial of benefits where the ALJ erred in evaluating claimant's pain because "he would have reached the same conclusion notwithstanding his initial error"); *Elder v. Astrue*, C.A. No. 3:09–2365-JRM, 2010 WL 3980105, at *9 (D.S.C. Oct. 8, 2010) ("As neither her medical records, nor her own statements, provide [evidence of the effect on her functioning or ability to work resulting from] her obesity, any failure of the ALJ to explicitly address [the claimant]'s obesity is only harmless error."); *Gassaway v. Astrue*, C.A. No. 8:07–4083-HFF-BHH, 2009 WL 462704, at *10 (D.S.C. Feb.23, 2009) (finding no error in the ALJ's assessment of the effect of obesity in combination with claimant's other impairments where claimant offered no argument as to what limitations she would experience as a result of her obesity).  Based upon the foregoing, the undersigned finds that the ALJ's decision with respect to the plaintiff's obesity is supported by substantial evidence.

## CONCLUSION AND RECOMMENDATION

The Commissioner's decision is based upon substantial evidence and is free of legal error.  Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

March 28, 2016
Greenville, South Carolina

33